

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00305-CV

IN THE MATTER OF W.Z.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-105051-17

----------

### MEMORANDUM OPINION[1]

----------

## I. Introduction

A jury found that Appellant W.Z., a juvenile, engaged in delinquent conduct by committing the state jail felony offense of theft in violation of penal code section 31.03(e)(4)(B),[2] and the trial court adjudicated him accordingly. At W.Z.'s

---

[1]*See* Tex. R. App. P. 47.4.

[2]Theft occurs when a person unlawfully appropriates property with the intent to deprive the owner thereof; it is a state jail felony, as pertinent here, when the property, regardless of value, is "stolen from the person of another." *See* Tex. Penal Code Ann. § 31.03(a), (e)(4)(B) (West Supp. 2017). At W.Z.'s August 2017 delinquency trial, the complainant and two Arlington police officers testified about W.Z.'s May 15, 2017 theft of the complainant's cell phone, and seventeen-year-

subsequent disposition hearing, W.Z. asked to be returned to his family "if the Court believe[d] that he c[ould] get the care and level of support and supervision that he need[ed] out on probation" or, if not, then to be placed in an out-of-state treatment facility. The trial court ordered the second option.

In a single issue, W.Z. now argues that the trial court abused its discretion by committing him to the out-of-state treatment facility because the evidence is legally and factually insufficient to support the trial court's findings under family code section 54.04(i). We affirm.

## II. Section 54.04(i) Findings

The trial court made the following findings in its order changing W.Z.'s custody, care, and control to the Glen Mills Schools in Pennsylvania: (1) reasonable efforts have been made to prevent or eliminate the need for W.Z. to be moved from his home and to make it possible for him to return to his home; (2) W.Z., in his home, cannot be provided the quality of care and the level of support and supervision that he needs to meet the conditions of probation; and (3) W.Z.'s best interest will be served by placing him outside of his home.[3] *See* Tex. Fam. Code Ann. § 54.04(i)(1)(A)–(C) (West Supp. 2017). W.Z. complains

---

old W.Z. stipulated to his mother's custody and address and his age (sixteen) at the time of the theft.

[3]In its order, the trial court also found that the best interest of the community would be served by placing W.Z. outside of his home. In an addendum to the change of custody order, the trial court found that placing W.Z. at the Glen Mills Schools, outside of Texas, would not produce undue hardship.

2

that the evidence is legally and factually insufficient to support these findings such that the trial court abused its discretion by committing him to Glen Mills.

The State responds that W.Z. requested commitment to Glen Mills if the trial court decided that he should be placed outside of his home and that ample evidence supports the trial court's residential placement decision.

## A. Standards of Review

A trial court has broad discretion to determine a suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re C.C.B.*, No. 02-08-00379-CV, 2009 WL 2972912, at *3 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.) (citing *In re H.G.*, 993 S.W.2d 211, 213 (Tex. App.—San Antonio 1999, no pet.)). An abuse of discretion occurs when the trial court acts unreasonably or arbitrarily without reference to any guiding rules or principles, but it does not abuse its discretion simply by basing its decision on conflicting evidence. *See id.*; *In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). And we will not find an abuse of discretion as long as some evidence of substantive and probative character exists to support the trial court's decision. *C.J.H.*, 79 S.W.3d at 702. In conducting our review, we engage in a two-pronged analysis: (1) Was there sufficient information upon which to exercise discretion, and (2) did the juvenile court err in its application of discretion? *C.C.B.*, 2009 WL 2972912, at *3; *see also In re C.C.*, No. 02-17-00216-CV, 2018 WL 1865804, at *3 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op.).

3

We apply the civil standards of review to W.Z.'s complaints about the sufficiency of the evidence. *See In re D.M.*, No. 02-17-00059-CV, 2018 WL 1630704, at *5 (Tex. App.—Fort Worth Apr. 5, 2018, no pet.) (mem. op.). When determining whether there is legally sufficient evidence to support the finding under review, we consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *In re M.E.*, No. 02-14-00051-CV, 2014 WL 7334990, at *2 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (mem. op.). Anything more than a scintilla of evidence supporting a finding renders the evidence legally sufficient. *D.M.*, 2018 WL 1630704, at *5.

When reviewing an argument that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Id.* at *6 (citing *M.E.*, 2014 WL 7334990, at *2; *C.J.H.*, 79 S.W.3d at 703).

## B.  Evidence

The trial court admitted into evidence W.Z.'s social history by the juvenile probation department, including his psychological evaluations—the most recent of which was from August 2016—a discharge summary, and a placement summary.

The trial court also heard testimony from W.Z.,[4] W.Z.'s mother, W.Z.'s supervising probation officer Peggy Joe Campos,[5] and Tarrant County Juvenile Services placement supervisor Debbie Spoonts.[6]

The evidence at the disposition hearing reflected that W.Z. was from an economically disadvantaged single-parent household[7] in which English was not the primary language and that his IQ was on the "low end of the average range,"[8]

---

[4]W.Z. testified that he understood that the trial court was going to decide whether he would go to prison, to the Texas Juvenile Justice Department (TJJD), to a placement outside of his home, or back to his mother's home. The disposition hearing took place on September 11, 2017, which was W.Z.'s sixth appearance before the juvenile court. W.Z. was fourteen when he received his first referral.

[5]Campos had been a Tarrant County juvenile probation officer for nine-and-a-half years at the time of the disposition hearing and had been W.Z.'s supervising probation officer since October 2015.

[6]Spoonts had been with the Tarrant County juvenile department for twenty-nine years and prepared the placement summary recommending that W.Z. be sent to Glen Mills.

[7]When W.Z. was one year old, his father was incarcerated for assaulting W.Z.'s mother and attempting to kidnap W.Z. He was deported when W.Z. was around six years old. W.Z.'s mother did not have a car; she walked to work and one of her friends drove her to court when her daughter was unavailable to drive her.

[8]According to W.Z.'s 2016 psychological evaluation, his academic achievement grade level was that of second or third grade in reading but fourth grade in math. W.Z., who was seventeen at the time of the disposition hearing, was in the ninth grade because of his history of truancy and refusal to attend school. His 2016 psychological evaluation noted that he also appeared to be below average in height and weight and mildly depressed "due to his ongoing poor decision-making" and poor impulse control. It was also noted that he did not appear to be trying his hardest during the academic testing.

although some of his academic underachievement was attributed to his lack of proficiency in English as a second language and some was attributed to his excessive truancy and substance abuse.

Child Protective Services became involved in W.Z.'s life in 2010 when the agency received an allegation that then-nine-year-old W.Z.'s older half-brother C., a member of the Sur 13 gang, had tried to carve "13" into W.Z.'s arm.[9] W.Z. looked up to C., who had a history with the juvenile probation department. C. gave drugs to W.Z. when W.Z. was around nine or ten years old. According to W.Z.'s mother, C. was not around much "because he was locked up often."

As a teenager, W.Z. began coming and going as he pleased, was verbally aggressive with his mother, refused to obey her rules, and used drugs like he had seen C. do.[10] According to Campos, W.Z.'s mother, who at times worked more than one job, had never shown an ability to control W.Z.'s behavior. Although W.Z.'s mother had seven children, her grandson and W.Z. were the only ones who lived with her. W.Z.'s home was described as "very chaotic" due to the lack of supervision, and his social history described his mother's parenting skills as inadequate.[11]

---

[9]According to W.Z.'s social history, C. only got as far as carving a "1."

[10]W.Z. testified that when he got to junior high, he graduated from "the small drugs to the big drugs."

[11]One portion of the social history stated that W.Z.'s mother "lacks the parenting skills and ability to parent youth. Mother works hard to get others to parent her child." Another portion stated, "Historically, mother calls PO constantly

6

W.Z.'s mother said that W.Z. was a good child at home but not when he went "out in the streets," where he paid more attention to his friends than to what she told him to do. W.Z.'s mother said that she had told him that she did not like for him to hang out with those friends and that he listened sometimes.

W.Z. started using drugs in 2014, the same year that his offense history began.[12] He frequently ran away from home and was placed on an electronic monitor on four occasions from September 2015 to March 2017 but cut it off each time only days later. W.Z.'s mother agreed that if W.Z. decided to run away, he would do it, regardless of what she or anyone else told him to do. His social history reflected that despite the Tarrant County Juvenile Department's efforts, W.Z.'s "non-compliance on supervision makes continued supervision difficult. [W.Z.] has demonstrated both in detention and while in residential treatment at G4S in Brownwood twice that he excels in a structured environment."

W.Z. tested positive for at least one drug—marijuana, methamphetamine, cocaine, opiates, or benzodiazepine[13]—every time he was tested, and even after

---

wanting the department to give youth consequences and place her child in a secure facility. Mother has had the expectation that JPD (or other agency) should be parenting her child."

[12]Beginning in July 2014, W.Z. was charged with evading arrest or detention and criminal trespass, and from 2014 to 2016, he acquired charges for resisting arrest, interference with public duties, running away, and failure to identify, in addition to frequently violating court orders.

[13]Xanax is a common brand name of benzodiazepine.

completing two residential drug treatment programs, he relapsed within two weeks to a month of his return home.[14] W.Z. had used marijuana, heroin, "crystal meth," and cocaine over the years, but he said that the last time he used the harder drugs (heroin, methamphetamine, and cocaine)[15] was before he turned fifteen.

As of May 16, 2017, the day after the cell phone theft,[16] W.Z. had been confined in the Tarrant County Detention Center. His participation in the Tarrant County Youth Recovery drug program ended on June 5, 2017, with a recommendation of an "involuntary long-term substance abuse treatment facility" due to his prior lack of success in voluntary treatment programs. According to the discharge summary recommendation, W.Z. "would benefit from a safe, controlled, and monitored environment where his actions and behaviors could be more closely modified and mentored" and "a structured living environment where his focus could be directed and redirected more successfully."[17]

---

[14]W.Z. was placed in G4S, a residential substance abuse treatment facility in Brownwood, Texas, from February 2016 to August 2016 but tested positive for marijuana and cocaine two weeks after his release. He went back to G4S from September 15, 2016, to January 10, 2017, but tested positive for marijuana and benzodiazepine within a month after his release. W.Z. acknowledged that when he was fifteen years old, one of his friends had died from a heroin overdose but that this had not stopped him from using drugs.

[15]W.Z. said that he did not consider cocaine to be a "hard" drug.

[16]W.Z. testified that he did not know why he had stolen the cell phone but denied that he had planned to sell it for drugs or to give it to a friend who was affiliated with Sur 13.

[17]W.Z. said that he had failed on probation because of drugs and his peers, stating, "[W]hen people text me it would be hard to say no to, like, to go there and

8

Campos testified that a placement was available to W.Z. at Glen Mills in Pennsylvania. Spoonts testified that Glen Mills was not a locked-down facility, even though W.Z. had successfully finished secure programs, because the juvenile department felt that Pennsylvania was far enough away and because "the amount of structure" in the program might be able to meet W.Z.'s needs better than another secure program. Spoonts said that the department felt like the most appropriate program in which to place W.Z. was Glen Mills, although she acknowledged that children in an unsecure placement in Arizona had run away. AMI Rio Grande, another program, had declined to consider W.Z. based on his runaway history.

Spoonts stated that the Glen Mills program usually lasted around a year, but because W.Z. would turn eighteen in less than a year, he could only stay there nine to ten months, until the day before his eighteenth birthday. Spoonts conceded that the Glen Mills program usually could not be completed in nine to ten months but said that it was possible to finish in less than nine months because the department had had a client who had done so.

Spoonts added that there would be a substance abuse component to Glen Mills that W.Z. would be enrolled in, but "[i]t's not going to be substance abuse treatment like going to rehab." Glen Mills mainly had a very strong education

smoke with them." He successfully completed G4S twice but lapsed back into drug use once returned to his mother because when he got his phone back, he would receive constant messages from his friends "to come and smoke with them," and it was hard to resist their peer pressure.

program, which W.Z. needed because he was "really behind in his education. His skills are at a very low level, and . . . [Glen Mills had] about 40 vocations, so he could get some job training [and] . . . could go all the way to get his diploma or his GED."

W.Z.'s mother wanted W.Z. to be placed in Pennsylvania because she wanted him to get the help that he needed, to get his high school education or a GED, and to overcome his drug problems.

W.Z. testified that he wanted to get his GED or high school diploma and to start working. W.Z. stated, "If the judge sends me to Pennsylvania I'm going to ask for all the help that I need, for me to get my GED and a trade for a job, and so when I get out of placement, I can apply for a company and work and get my GED." He noted that most of his former drug-using friends were "in jail or prison." W.Z. told the trial court that he wanted to develop skills so that he could get a job and help his mother and that he wanted to get help with his drug problem; if the trial court sent him to Pennsylvania, he knew that he would not be bothered by his old friends "because it's far away from home."

## C. The Trial Court's Ruling

The trial court observed that it had been proven "beyond a shadow of a doubt" that the resources available in the community while W.Z. lived at home were "clearly not sufficient for [W.Z.] to get successfully through a term of probation," and based on the evidence set out above, we agree with the trial court's

10

assessment.[18] Notwithstanding many opportunities to comply with his probation requirements, W.Z. continued to use drugs, remove his electronic monitor, and commit offenses, and no one contradicted the evidence that W.Z.'s mother could not parent him effectively. Accordingly, we overrule W.Z.'s argument that the evidence is insufficient to support the trial court's finding that he could not be provided with the quality of care and level of support and supervision in his home needed to meet the conditions of probation.

We likewise agree with the trial court's finding that reasonable efforts had been made to prevent or eliminate the need for W.Z. to be moved from his home and to make it possible for him to return home, particularly considering his two previous residential stays for drug treatment and four different opportunities on an electronic monitor. In light of the evidence above and W.Z.'s relapse rate into negative habits and drug use when in his unstructured home environment and around negative peers, the trial court's only clear options were either to send W.Z.

---

[18]The trial court ruminated as follows at the hearing,

> Now the dilemma is what on earth to do with you because I have an obligation to protect this community, which I live in, from you. I also have to try to figure out what on earth the juvenile probation department has left for it to do for you because we've tried everything. We've tried -- I mean I personally allowed you [to] get a GED. I don't even know if you remember that, but you were in my court and I was hearing the same arguments from you that school wasn't your thing, and so I ordered for you to go get your GED through JJAEP. Do you remember that?

W.Z. acknowledged that he did recall and said that he had failed the test.

out of state to Glen Mills—which W.Z., his mother, and the probation department all agreed would be in his best interest—or to confine him to TJJD, as argued by the prosecutor.[19]  Accordingly, the trial court did not abuse its discretion by finding that W.Z.'s best interest would be served by placing him outside of his home.  We overrule W.Z.'s sole issue.

### III.  Conclusion

Having overruled W.Z.'s sole issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; KERR and PITTMAN, JJ.

DELIVERED:  August 9, 2018

---

[19]The State argued that W.Z. should be placed in TJJD because Glen Mills was not a secure, lockdown facility or drug placement program and because TJJD would be able to keep him for longer—until he turned nineteen.